Filed 2/20/24  P. v. Queen CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>MATTHEW RICHARD QUEEN,<br><br>    Defendant and Appellant. | F084514<br><br>(Super. Ct. No. BF181155A)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  Charles R. Brehmer, Judge.

Michael C. Sampson, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Kari Ricci Mueller and Jeffrey D. Firestone, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

## **INTRODUCTION**

Appellant Matthew Richard Queen committed a series of crimes related to the manufacturing of firearms. He was convicted by jury of second degree murder (Pen. Code,[1] § 187, subd. (a), count 1); criminal threats (§ 422, count 6); assault with a semiautomatic firearm (§ 245, subd. (b), count 7); first degree burglary with a non-accomplice present (§§ 460, subd. (a), 667.5, subd. (c)(21), count 10); kidnapping (§ 207, subd. (a), count 11); conspiracy to manufacture a semiautomatic firearm (§§ 182, subd. (a)(1)/30600, subd. (a), count 14); possession of a firearm by a felon (§ 29800, subd. (a)(1), counts 16-19, 23, 28, 31, 33); manufacturing, distributing, or transporting assault weapons (§ 30600), counts 20, 21, 24, 25); possession of ammunition by a felon (§ 30305, subd. (a)(1), counts 22, 29, 34); unlawful possession of an assault weapon (§ 30605, counts 27, 30, 32); and resisting arrest (§ 148, subd. (a)(1), 35). In addition, the jury found true an enhancement for the personal use of a firearm (§ 12022.5, subd. (a)), and the court found that Queen had suffered a prior conviction which qualified as a prior serious felony (§ 667, subd. (a)) and a strike within the meaning of the three strikes law (§§ 667, subds. (c)-(j) & 1170.12, subds. (a)-(e)). Queen was sentenced to an aggregate term of 30 years to life in state prison, plus a determinate term of 58 years.

Queen raises the following claims on appeal. First, the trial court abused its discretion by declining to sever the counts related to the murder of Micah Holsonbake (counts 1-5), from all remaining counts (counts 6-35). Second, the trial court abused its discretion by admitting evidence of recorded phone calls between Queen and his friend, R.S., as evidence of modus operandi ("the wiretap evidence"). Third, the trial court failed to tailor the instruction on aiding and abetting to the crime of implied malice murder, permitting the jury to convict Queen of murder based upon imputed malice.

---

[1] All undefined statutory citations are to the Penal Code unless otherwise indicated.

The Attorney General asserts that the minute order from Queen's sentencing hearing and abstract of judgment must be amended to accurately reflect the trial court's oral pronouncement of judgment. We agree.

We will order the trial court to correct the abstract of judgment and minute order from Queen's sentencing hearing. Finding no merit to Queen's contentions, we affirm the judgment of conviction.

## PROCEDURAL HISTORY

On May 18, 2021, the Kern County District Attorney filed an information charging Queen with the following crimes: first degree murder (§ 187, subd. (a), count 1); conspiracy to commit murder (§§ 182, subd. (a)(1)/187, subd. (a), count 2); torture (§ 206, count 3); conspiracy to commit torture (§§ 182, subd. (a)(1)/206, count 4); kidnapping (§ 207, subd. (a), counts 5 & 11); criminal threats (§ 422, counts 6 & 8); assault with a semiautomatic firearm (§ 245, subd. (b), counts 7 & 9); burglary (§ 460, subd. (a), count 10); assault with a firearm (§ 245, subd. (a)(2), count 12); assault by means likely to cause great bodily injury (§ 245, subd. (a)(4), count 13); conspiracy to manufacture a semiautomatic firearm (§§ 182, subd. (a)(1)/30600, subd. (a), count 14); manufacturing an assault weapon (§ 30600, counts 15, 20, 21, 24, 25); possession of a firearm by a felon (§ 29800, subd. (a)(1), counts 16-19, 23, 26, 28, 31, 33); possession of ammunition by a felon (§ 30305, subd. (a)(1), counts 22, 29, 34); unlawful possession of an assault weapon (§ 30605, counts 27, 30, 32); and resisting arrest (§ 148, subd. (a)(1), count 35).

The information further alleged enhancements for the personal use of a firearm during the commission of the offense (§ 12022.5, subd. (a), counts 6-8, 12, 13), the presence of a non-accomplice during the commission of a burglary (§ 667.5, subd. (c)(21), count 10), and that Queen had suffered a prior conviction that qualified as a serious felony (§ 667, subd. (a), counts 1-11, 14) and a strike within the meaning of the three strikes law (§§ 667, subds. (c)-(j) & 1170.12, subds. (a)-(e), counts 1-11, 14-34).

3.

On May 5, 2022, a jury found Queen guilty of second degree murder, a lesser-included offense of the crime charged in count 1; criminal threats against M.F. (count 6); assault with a firearm against M.F. (count 7); first degree burglary (count 10); the kidnapping of C.S. (count 11); conspiracy to manufacture a semiautomatic firearm (count 14); possession of a firearm by a felon (counts 16-19, 23, 28, 31, 33); manufacturing, distributing, or transporting assault weapons (counts 20, 21, 24, 25); possession of ammunition by a felon (counts 22, 29, 34); unlawful possession of an assault weapon (counts 27, 30, 32); and misdemeanor resisting arrest (count 35).

In addition, the jury found true the personal firearm enhancement allegations alleged as to counts 6 and 7, and the presence of a non-accomplice during the commission of the burglary alleged in count 10. The trial court found true the prior serious felony conviction enhancement. Queen was acquitted on all remaining counts.

On June 7, 2022, the trial court sentenced Queen to an aggregate term of 30 years to life in state prison, plus a determinate term of 56 years.

Queen filed a timely notice of appeal.

## STATEMENT OF FACTS

Queen illegally manufactured and possessed firearms. He also frequently used drugs and engaged in assaultive crimes. Through his criminal endeavors, he associated with Matthew Vandecasteele, C.S., Sarah Wedemeyer, M.F, Micah Holsonbake, and Bailey Despot, all of whom were friends or mutual acquaintances with one another.

*Conspiracy to Manufacture Firearms (Count 14), Manufacturing Assault Weapons (Counts 20, 21, 24, 25), and Possession of Firearms (Counts 16-19, 23) and Ammunition (Count 22) by a Felon*

On December 11, 2017, Officer George Vasquez with the Bakersfield Police Department and his partner initiated a traffic enforcement stop on a Chevrolet Suburban. Queen was driving and Despot was the passenger.

4.

While conducting a protective sweep of the vehicle, the officers observed a rifle case in the backseat of the Suburban, in plain view, as well as two handguns in the center console of the vehicle, which had its lid partially up. A search of the vehicle ultimately yielded three gun magazines, two of which were high-capacity ammunition magazines. One of the magazines was loaded into a firearm. All of them contained live rounds.

Officers also found four firearms, including: a purple Smith and Wesson model M&P Shield; a .40-caliber semiautomatic pistol; a Zastava Arms M70A nine-millimeter semiautomatic pistol; an unknown make and model semiautomatic rifle AR-15-style chambered for the .223 Wylde; and an unknown make and model AR-15-style semiautomatic nine-millimeter rifle. The latter two qualified as assault weapons and appeared to be custom built. All four firearms were loaded, contained live rounds, and were operational and capable of shooting. Officers also found a black BiLT motorcycle jacket in the vehicle.

In July 2018, officers discovered that Queen had purchased gun parts, including triggers, tubes, flash suppressors, and receivers, multiple times over the course of multiple months. He had also purchased gun manufacturing equipment, including milling equipment, purchased in his ex-wife's name.

Throughout the course of their investigation, investigators learned that Queen was selling firearms, and that Despot had assisted Queen in this endeavor. Facebook messages sent by Queen depicted numerous photographs of firearms that were never recovered by police.

Despot had also texted her friend M.F., to "find out if anyone [she] know[s] wants to buy guns." Facebook messages also showed that Despot was trying to sell a nine-millimeter Colt AR-15 with a silencer. Despot's message suggested that Queen had manufactured it. Queen denied manufacturing silencers but admitted that he had built the type of gun referenced in Despot's Facebook message.

***Criminal Threats (Count 6) and Assault with a Firearm (Counts 7 & 8) Against M.F.***

On December 31, 2017, Queen, Despot, Holsonbake, and M.F. went shooting together. That evening, M.F. and A.S., a man with whom M.F. was in a dating relationship, met at Queen's home.

At one point during the evening, Queen stated that a gun that was in the guestroom of his home had gone missing. Queen became very angry and accused A.S. and Holsonbake of stealing it. Despite efforts to find the gun, it was never found.

On the night of January 20, 2018, Queen picked up M.F. to take her to his home; M.F. and Despot had plans to hang out. When Queen arrived, Holsonbake was sitting in the front passenger's seat of Queen's SUV. Instead of driving home, Queen drove to the orchards.

Holsonbake, who had a known fear of the orchards, began acting erratically. He jumped out of the vehicle while it was still moving and ran. Queen laughed. He stopped the vehicle shortly thereafter.

Queen ordered M.F. out of the vehicle. He went to the trunk of his vehicle and retrieved a large firearm. With the exception of the light from Queen's vehicle headlights, it was completely dark outside.

Queen pointed the firearm to M.F.'s head from about a foot away and asked her how she would feel if her daughter grew up without a mother. He had a serious expression on his face. M.F. dropped to her knees and begged for her life. She thought she was going to die.

Queen asked M.F. whether Despot, with whom Queen was in a dating relationship, had been cheating on him. M.F. told him that Despot was not. Queen told

M.F. to get up and get back into the vehicle. M.F. complied. Queen and M.F. then searched for Holsonbake but were unable to find him.[2]

On March 21, 2018, two days before Holsonbake's murder, M.F. went to Queen's home to hang out with Despot. M.F. brought her one-year-old daughter with her. During the course of her visit, M.F. brought up Queen's gun that went missing on New Year's Eve. She also told Despot that she should leave Queen.

Queen furnished a handgun, pulled back the slide, pointed it at M.F., and told her to "get the fuck out." M.F.'s daughter was standing in between M.F. and Queen.

According to M.F., Despot attempted to intervene, but Queen slammed Despot against a wall. Queen chased M.F. outside and followed her into the street. She began walking home with her daughter, in the rain.

As M.F. began exiting the neighborhood, Queen pulled up in his vehicle alongside M.F. and told her to get inside. M.F. accepted a ride home from Queen because she did not want her daughter to get sick.[3]

On March 30, 2018, M.F. and Despot exchanged text messages. In one message, M.F. texted Despot, " '[Holsonbake] got my ass in a lot of shit. Almost killed.' " She continued, " '[Holsonbake] stole from the wrong person who used to be my friend and now I've gotten an AR and a Glock pointed to me because of it. And ever since, nobody can get a hold of him.' "

M.F. saved various screenshots in her phone from a Facebook group that she, Holsonbake, Despot, and Vandecasteele claimed membership to. Someone in the

---

[2] Law enforcement responded to a call from a neighbor nearby who had reported that someone was screaming for help. Holsonbake was arrested for an outstanding warranted.

[3] Queen was acquitted on the charged crime of assault with a semiautomatic firearm (count 8) arising from this incident.

Facebook group published a meme on the group page that referenced Holsonbake owing Queen money.

On January 26, 2018, eight days after Queen drove M.F. and Holsonbake to the orchards, Holsonbake uploaded a meme to the group's Facebook page with the following caption: "the exact expression Matthew Queen has on his face while driving you to the almond orchards to be executed." M.F. also published meme's ostensibly referencing the orchard incident, including a photograph of two subjects in a vehicle with the caption, " 'I'm about to jump out.' " Holsonbake responded, " 'that's what it felt like.' "

Despot also sent messages to Holsonbake referencing the orchard incident, writing, " 'You leave [M.F.] to die and come to dispose of me #asshole of the year.' " Holsonbake replied, " 'Asshole of the year. … What special title or nickname do you have for the dude who actually was about to smoke you all? Is he this year's asshole runner-up?' "

On March 30, 2018, Queen sent M.F. threatening Facebook messages in relation to the firearm that went missing on New Year's Eve. Queen had become convinced that A.S. had stolen the gun, and he was angry at M.F. for bringing A.S. into his home. That same day, M.F. sent the following Facebook message to Despot, referencing the second time Queen threated her (M.F.) with a firearm: " 'And yet I've gotten a gun pointed to my head twice for trying to help and been accused of lying. Mind you in front of my one-year-old daughter.' "

### The Burglary and Kidnapping of C.S. (Counts 10 & 11) and Dog Shock Collar Incident (Counts 12 & 13-Acquittals)

C.S. met Queen in 2017 through C.S.'s activities selling narcotics. They eventually began building guns together.

On one occasion, C.S. accidentally took Queen's AR-15 lower receiver. C.S. initially denied taking the receiver because Queen became so angry over its disappearance.

On November 21, 2017, C.S. went to Queen's home, believing the incident had blown over. Holsonbake was also present, which initially put C.S. at ease. At some point however Queen's demeanor changed from jovial to serious. He zip-tied C.S.'s arms to a chair and put a dog shock collar around C.S.'s neck. Holsonbake sat across the table from C.S., afraid and unable to help.

Queen was angry about the AR-15 lower receiver. He shocked C.S. Queen attempted to get Holsonbake to shock C.S. as well, but Holsonbake refused. Queen pistol whipped C.S., striking C.S.'s left orbital eye socket with the barrel of a nine-millimeter AR-15, causing C.S. to bleed profusely.

C.S. admitted that he had taken Queen's lower receiver. Queen then placed a band-aid on C.S.'s face, drew a smiley face on it, and removed the zip ties from C.S.'s arms. Queen resumed a friendly demeanor and told C.S. that if he had been honest with him initially, none of this would have happened. C.S. sustained significant bruising and swelling from the incident, but he did not report it to law enforcement.

Afterwards, C.S. began to avoid Queen and cut off all communication with him. C.S. also moved without telling anyone. He felt like Queen was trying to kill him.

On January 27, 2019, C.S. was staying at an acquaintance's duplex in Oildale. He was awoken from his sleep after he was kicked. When he awoke, C.S. saw Queen, Joseph Diagocomo, and William Brown standing over him.[4] Diagocomo was C.S.'s former roommate and Brown was a friend of Queen's brother.

Queen was wearing a plate carrier without the plates inserted, which C.S. described as a bullet-proof vest. The handle of a pistol was sticking out of the top of Queen's vest.

---

[4] The court granted Diagocomo use immunity for his testimony, and criminal charges pending against Brown were dismissed in exchange for his truthful testimony.

The men ordered C.S. to get up and go outside to their truck.  They took C.S.'s cell phone.  As C.S. began to put on his pants and socks, Queen remarked, " 'You don't need socks where you're going.' "  C.S. was afraid.

The men forced C.S. into a truck outside.  At some point during the car ride, Queen stuck his gun in C.S.'s face, stating, "I'm going to shoot this mother fucker right now."  C.S. believed Queen, who always had firearms on his person, was going to do it.  Queen only subsequently revealed that his gun was actually a BB gun.

Queen accused C.S. of snitching on him to the police.  Queen claimed that the police had searched his home, including his gun safe, based on accusations made by C.S.  C.S. had been released from jail the previous night pending sentencing on a criminal case.  Queen, who was facing gun-related charges, falsely believed that C.S. had been released because he had acted as an informant.

At some point during the incident, C.S. was under the impression that Queen was recording him.  Queen attempted to get C.S. to admit that C.S. was the one selling weapons, and not Queen.

The group eventually drove to a post office in Oildale and made C.S. get out of the truck.  They kept his shoes and the battery from his cellular phone.  C.S. walked back to the duplex he was staying at, barefoot.

C.S. testified that Queen had previously mentioned having dug graves for people and suggested killing a person with whom C.S. had issues.  In fear for his life, C.S. and his girlfriend left the state, despite the fact that he had been ordered to return for sentencing on his criminal case.  He was later extradited back to Kern County.

***Incident at the Red Roof Inn with S.B. (Count 9-Acquittal)***

On one occasion, Queen had dropped his identification in Vandecasteele's car.  At some point thereafter, S.B., an acquaintance, told Queen that Vandecasteele was using his identification to cash fraudulent checks.  Queen confronted Vandecasteele with a firearm, demanding Vandecasteele return his identification.

10.

On April 15, 2018, Vandecasteele and Wedemeyer, who were in a dating relationship, drove with Queen to the Red Roof Inn to confront S.B. about his allegations. Vandecasteele exited the vehicle, ran towards S.B., and pointed an AR-15 rifle at him. Queen exited the vehicle with a pistol.

S.B. ran into his hotel room, locked the door, and called the police. Vandecasteele was taken into police custody for the incident, but Queen was not.

### *The Murder of Micah Holsonbake (Count 1)*

On April 4, 2018, Holsonbake was reported missing to police by his mother, C.H. Due to the unrelenting efforts of his family, his case garnered significant media coverage. Holsonbake became known as one of the "Bakersfield 3."[5]

**1. Holsonbake's Partial Remains Are Found**

On August 19, 2018, A.C. was hanging out with friends inside of Hart Park near the Kern River. When they went into the river, they observed a bag moving in the water. The bag was heavy, weighing approximately 40 to 45 pounds. Believing it could contain valuables, the group opened it and saw a sweater inside. A.C. and his friends walked the bag to the shore and emptied its contents.

Rocks and human remains, including, a severely decomposed human arm, spilled out. They contacted the police.

Kern County Sheriff's Lieutenant Jason Colbert responded to the call, along with other deputies. Lieutenant Colbert observed a zip tie around the wrist of the decomposed

---

[5] Despot, who disappeared around April 27, 2018, is also one of the missing person's referred to as the "Bakersfield 3." Pursuant to an in limine ruling by the trial court, the jury did not hear information pertaining to her disappearance, except for a text message sent from her phone.

On April 27, 2018, the following text message was sent from Despot's phone to one of Despot's friends: " 'I fucked up and need to disappear for a while. Can't use this phone anymore. I'll call you when I get a new number.' " Despot has not been seen or heard from since.

arm. Inside of the bag, deputies also found a piece of black and orange nylon rope, a black nylon bag, and a black zip-up sweater.

A fingernail from the arm was extracted and sent to the Department of Justice for DNA analysis. DNA test results from the fingernail were compared to DNA taken from the birth parents of Micah Holsonbake. The results confirmed that the arm and fingernail belonged to Holsonbake.

Almost three years later, on August 1, 2021, a young girl was swimming at Lake Ming with her family. While looking for clams, she noticed a bag submerged in the water. Curious as to what could be inside, the girl grabbed straps attached to the bag and pulled it up. A family member opened it.

Inside were two bags, one black and one red, a vape pen or lighter, a phone, and a human skull. The skull was inside a red and black BiLT bag. A witness called 911 and Kern County Sheriff's Deputies responded.

DNA testing confirmed that the skull was Holsonbake's. Dr. Alexis Gray, a forensic anthropologist, examined Holsonbake's partial remains. Holsonbake's skull was missing its two front teeth and a portion of the skull had a green staining pattern on it, which is typically associated with bullets or a penny.

Dr. Gray further observed that Holsonbake's skull had sustained trauma on its right and left sides, there was an unidentifiable hole in the skull, and that the skull had been severed from Holsonbake's body postmortem. Dr. Gray opined that the cause of death was a severe head injury, and although the cause of the injury was unknown, Dr. Gray could not rule out the possibility that the injury was caused by a gunshot.

Dr. Eugene Carpenter, another forensic pathologist who had examined Holsonbake's remains, opined that the injuries to Holsonbake's skull could have been caused by unusual massive blunt force or a powerful copper coated projectile going through the head. Dr. Carpenter opined that one of the wounds to Holsonbake's skull was consistent with but not specific to a gunshot wound.

12.

### 2. Queen Becomes a Suspect in Holsonbake's Disappearance

In 2017, Vandecasteele was living in an apartment on North Half Moon Drive in Bakersfield. He met Queen while he was out playing pool one night, and then subsequently met C.S., Despot, and Holsonbake when they showed up at his apartment on various occasions to drink or to use methamphetamines.

Vandecasteele and Queen would do methamphetamine and shoot homemade guns together. Vandecasteele assumed that Queen had built the guns, which were assault rifles, because Queen had showed him how to use a mill.

On April 24, 2018, Vandecasteele was in custody for assault with a firearm for the Red Roof Inn incident. While in jail, Vandecasteele learned that Wedemeyer, with whom he had been living and was in a dating relationship, had begun dating Queen and was in the process of moving in with him. Vandecasteele was infatuated with Wedemeyer and was upset by this news.

On June 29, 2018, Vandecasteele called Wedemeyer from jail. During the call, Vandecasteele told Wedemeyer, " 'You remember where Micah is because you[ were] at my fucking house that night. You're probably going to end up the same way if you do him dirty.' "

Pursuant to the police investigation into Holsonbake's disappearance, Detective Chad Garrett listened to Vandecasteele's recorded jail phone calls, and wanted to speak with him. While incarcerated at Wasco State Prison, Vandecasteele made statements to Detective Garrett and Detective Bagby concerning Holsonbake, and the night Holsonbake disappeared.

Following Vandecasteele's interrogation and during the course of their ensuing investigation, the detectives learned that on March 23, 2018, Queen called Vandecasteele to tell him that he and Despot were coming over. Vandecasteele's apartment had a detached garage that he used to run a chop shop.

Queen stated that he wanted to use Vandecasteele's garage to confront Holsonbake about the theft of Queen's gun. Queen wanted to get Holsonbake to admit that he had stolen it. Vandecasteele agreed and unlocked the garage and gate before Queen arrived.

Vandecasteele, Wedemeyer, Queen, and Despot were at Vandecasteele's apartment. Vandecasteele claimed that once Queen and Despot arrived, he did not look into the garage. He and Wedemeyer were too preoccupied with getting high on drugs.

At some point during the evening, Despot and Queen came inside the apartment and Despot asked Vandecasteele for a knife. Vandecasteele gave her a small paring knife and Despot returned to the garage. Vandecasteele told detectives that Queen returned to the garage 10 to 15 minutes later.

A while later, Despot came back into the apartment and asked Wedemeyer for a change of clothing. Vandecasteele noticed that Despot was acting strange and that she appeared to be pale and shaken up.

Vandecasteele asked whether it was okay for him to enter the garage. Queen responded affirmatively, explaining, " '[h]e cleaned everything up.' " After Despot changed, she and Queen left.

The next day, Vandecasteele inspected the garage. He noticed a large stain on a shelf, which he believed to be a grease stain. The stain, which was not previously there, was later determined to be Holsonbake's blood.

That same day, Queen asked Vandecasteele to help him dispose of " 'stuff from last night.' " Queen had a large black and yellow container in the back of his truck. Vandecasteele, sick after a night of doing drugs, stayed home.

On March 27, 2018, a few days later, Vandecasteele searched Google for "how long does it take to dissolve a human body." Vandecasteele accessed an article about using lye to dissolve a body and searched for how to obtain lye. Vandecasteele claimed that the episode in his apartment left him with an eerie feeling that there could be a

14.

serious confrontation between him and Queen. He testified that if it came down to a choice between Queen's life and his own, he would kill Queen and dissolve his body.

### 3. Other Evidence Implicating Queen

During the time that M.F. knew Queen, she heard Queen state that he was going to torture Holsonbake in a garage that Queen ominously referred to as a "torture chamber." Queen also stated that he was going to severely hurt Holsonbake and that he wanted to kill him. Despot expressed willingness to go along with Queen's intentions.

Following Holsonbake's disappearance, Holsonbake's family and friends reached out to Queen to see whether he had seen Holsonbake. Queen claimed that the last time he had seen Holsonbake, Holsonbake was " 'hotel hopping with a girl name[d] Sarah and a couple of dogs, hiding from something. Didn't want anybody to know where he was staying.' "

In recorded jail phone calls and Facebook messages, Queen blamed an array of individuals for Holsonbake's disappearance and subsequently, his murder, including: the Hells Angels; "LA Mike," a known drug dealer and friend of Holsonbake's; a friend's boyfriend whom Queen claimed was a bookie; Despot; and even the cartel. Queen also created Facebook profiles using fake names and attempted to contact Holsonbake's family, as well as M.F.

During one recorded jail phone call, Queen was speaking to Vandecasteele. While referring to Holsonbake, Queen stated, " 'Everyone fucking smacks you and points a gun at you.' " Queen later explained that he was referring to everyone except for himself.

Queen also began following the investigation into Holsonbake's disappearance. He conducted numerous internet searches for the "Bakersfield 3," and accessed the Facebook webpage related to the Bakersfield 3. On a news article for the Bakersfield 3, Queen commented, " 'What if one of the BK-3 was responsible for the other BK-3? Would the parents still be as supportive to one another?' " He also wrote, " 'First Micah, …who's next? Me?' "

On May 25, 2018, Despot's mother called the Kern County Sheriff's Department. The homeowner of a residence on Reina Road reported that Queen had dropped off items at the front door of the home. One of those items was a purse which belonged to Despot. Sheriff's deputies found an orange and black rope tied around the strap of the purse.

Through a cordage examination, law enforcement determined that the black and orange rope found with Holsonbake's severed arm, matched rope found in Despot's purse, Vandecasteele's garage, and a headboard in Queen's bedroom. Meaning, all four samples came from the same source or a source with the same color, composition, and construction. Queen's DNA could not be excluded as DNA found on some of the rope samples.

In a text message conversation on March 24, 2018, the night after Holsonbake was murdered and dismembered, Despot texted Queen, " 'What did you do all night because you sure as hell didn't sleep with me?' " Queen responded, " 'Sorry about last night. The job took longer than expected. You know how I like to do things the right way. *Never cutting any corners*. Thanks, by the way, for bringing it up in text.' " Despot responded, " 'Didn't bring nothing up. I'm tired of you going to Matt's.' "

### Queen is Arrested and Firearms Are Found in His Possession (Counts 27-35)

On July 15, 2019, Queen was arrested following a police pursuit at his worksite. The day after his arrest, weapons were found inside of his lunchbox, briefcase, bag, and a case—all at his worksite. Facebook messages showed that Queen had previously sent a photograph of one of the weapons, a 6.5 Creedmoor rifle. The Creedmoor rifle qualified as an assault weapon and was fully operable. DNA on the firearm belonged to Queen.

On July 17, 2019, police officers searched Queen's Suburban. Inside, they found a blue bag containing two rifles, including, a nine-millimeter rifle and a .556-caliber semiautomatic rifle. Both rifles qualified as assault weapons and were fully operational. They were also manufactured 80 percent with no identifying markings or serial numbers.

*Defense Case*

S.H. testified that around the time of Holsonbake's disappearance, he was acting paranoid and violent. Shortly before his disappearance, Holsonbake had choked S.H.

D.M., a friend of Holsonbake's, opined that Holsonbake was grappling with mental health issues around the time of his disappearance, and described his behavior as erratic and paranoid. She further explained that Holsonbake was using methamphetamines, which would exacerbate his mood swings.

Trial counsel elicited testimony showing animosity between Holsonbake and Despot and that the two had exchanged violent threats. Despot, who was known to carry a grudge, had a continually growing list of individuals who had wronged her. It was not clear if Holsonbake was on that list.

However, Brown, a close friend of Queen's, testified that Despot once told him, "I want to kill that motherfucker [Holsonbake] one of these days if I get the chance." Brown described Despot as "beautiful [but] so full of hate." One of the reasons that Despot was angry with Holsonbake was because he had stolen a gun or swapped it with hers, and the firing pin was defective.

Queen testified that on March 22, 2019, he and Holsonbake were hanging out at Queen's house. Queen teased Holsonbake about a recent sexual encounter Holsonbake had by implying that the encounter had not been consensual. Queen claimed that Holsonbake pointed a gun at him. When Despot walked into the garage, Holsonbake pointed the firearm at her.

Queen tackled Holsonbake to the ground. During an ensuing struggle, Queen zip-tied Holsonbake's hands behind his back. According to Queen, Despot unexpectedly dropped a 40-pound dumbbell on Holsonbake's head, killing him. Queen panicked.

To prevent Queen's young son from walking in and seeing Holsonbake's body, Queen and Despot wrapped the body in a roll of plastic, cleaned the garage, and took the

17.

body to Vandecasteele's garage. Once there, they dismembered Holsonbake's body. Queen smoked methamphetamine while he was at Vandecasteele's house.

After they left Vandecasteele's home, Queen and Despot spent the day traveling to various locations to determine where to dispose of Holsonbake's remains, eventually settling on multiple sites for this purpose. Despite Queen's assistance, law enforcement never recovered the dumbbell that Despot purportedly used to kill Holsonbake.

With respect to the other assaultive crimes described by C.S., M.F., and S.B., Queen minimized his culpability. He denied ever threatening these individuals with a firearm. Queen further claimed that incident wherein C.S. was zip-tied to a chair and pistol whipped was perpetrated by Holsonbake, and not himself.

## DISCUSSION

I. **The Trial Court's Denial of Queen's Motion to Sever the Charges Related to Holsonbake's Murder From All Remaining Charges**

Queen contends that the trial court prejudicially erred by denying trial counsel's motion to sever the charges related to Holsonbake's murder (counts 1-5) from all remaining charges (counts 6-35). We conclude that Queen has failed to show that the trial court abused its discretion in denying his motion.

### A. *Background*

Queen moved in limine to sever the counts related to Holsonbake's murder from the non-murder counts. Trial counsel asserted that evidence supporting the non-murder charges was irrelevant, highly prejudicial, and unduly inflammatory as to the charges related to Holsonbake's murder.

The trial court simultaneously addressed the admissibility of the wiretap evidence (see part II, *post*) and trial counsel's motion to sever, finding that the motions raised similar issues. The court's preliminary ruling was that the evidence was "all related, and it shows a picture of how we get to the point that we get to, whatever happened or didn't

18.

happen on the dates in question.  Without that information, it really doesn't make sense."
It invited argument from the parties.

Trial counsel acknowledged that the charges related to Holsonbake's murder and the non-murder charges may be loosely related to a gun-sales conspiracy, but asserted that the cases would potentially implicate different defenses.  For example, Queen may elect to testify to defend against some of the charges, whereas he may rely on the state of the evidence as a defense to other charges.  Trial counsel further asserted that the disappearance of Despot could become an issue based upon the evidence adduced at trial, even though Queen had not been charged with crimes related to her disappearance.

The prosecutor stated that he had no intention of arguing how or why Despot had disappeared, or that Queen was a suspect in her disappearance.  With respect to Despot, the prosecutor explained that she was integral to the alleged torture, kidnapping, and murder of Holsonbake, and alleged that she had conspired with Queen to manufacture and sell assault weapons.  Consequently, Despot could not be excised from the case.

The prosecutor further explained that all of the crimes, including Holsonbake's murder, were intertwined with Queen's gun-manufacturing activities, and that everyone in the Facebook group—M.F., Despot, Queen, Wedemeyer, Vandecasteele, and Holsonbake, were either victims, witnesses, coconspirators, or some combination thereof.

The prosecutor stated, "[Queen's] continuing behavior that overlaps both in style, in items that are used, [(i.e., modus operandi),] and also what the basis and reasons for those criminal acts are, the reasons that they occur [i.e., motive and intent]).  So that's why I think all the charges, as they sit, are appropriately charged."

The trial court observed that most of the witnesses who may have been victims in the non-murder case would be witnesses in the murder case, and would testify about their involvement in the manufacture of firearms.  It further observed that there may have been communication between those involved in the firearm manufacturing activities and Queen.  (*Ibid.*)  And, if the witnesses, who were victims in the non-murder case, were to

testify about the firearm manufacturing in the murder case, the fact that they were victims of assaultive crimes perpetrated by Queen could be relevant to their credibility and bias. (*Ibid.*)

The trial court denied trial counsel's motion to sever, explaining, "It would make no sense … to not have that information before this jury for a variety of reasons.  One, to understand the sequence of events and put those in place, … it would be relevant as to the witness testimony and what their motivation is for saying whatever they're saying."

Prior to its ruling, the trial court had clarified that it would be considering Evidence Code section 352 for every ruling that it would make.  Thus, in denying trial counsel's severance motion, the court implicitly ruled that the evidence pertaining to the murder and non-murder charges was not inadmissible under Evidence Code section 352.

## B.     *Relevant Legal Principles*

"The law prefers trying charged offenses together because doing so ordinarily promotes efficiency."  (*People v. Anderson* (2018) 5 Cal.5th 372, 388 (*Anderson*); see *People v. Westerfield* (2019) 6 Cal.5th 632, 689 ["Because it ordinarily promotes efficiency, joinder 'is the course of action preferred by the law.' "].)  "[S]ection 954 embodies this preference."  (*Anderson*, at p. 388.)

Section 954 states, in relevant part, "[a]n accusatory pleading may charge two or more different offenses connected together in their commission, ... or two or more different offenses of the same class of crimes or offenses, under separate counts."  Offenses are connected together in their commission " ' " 'when they are ... linked by a " 'common element of substantial importance,' " ' " ' " like motive or intent.  (*People v. Westerfield*, *supra,* 6 Cal.5th at p. 686.)  " 'Offenses of the same class are offenses which possess common characteristics or attributes.' "  (*People v. Landry* (2016) 2 Cal.5th 52, 76.)

Even if "joinder is proper, the court may order the counts tried separately." (*Anderson, supra*, 5 Cal.5th at p. 388; see § 954 ["[T]he court ..., in the interests of justice

and for good cause shown, may in its discretion order that the different offenses or counts set forth in the accusatory pleading be tried separately or divided into two or more groups and each of said groups tried separately"]; accord, *People v. Merriman* (2014) 60 Cal.4th 1, 37.)

Where, as here, the statutory requirements for joinder are met, "the court may order the counts tried separately." (*Anderson*, *supra*, 5 Cal.5th at p. 388.)  The " 'defendant must make a clear showing of prejudice to establish that the trial court abused its discretion in denying the defendant's severance motion.' " (*Anderson*, *supra*, 5 Cal.5th at pp. 388-389.)  In determining whether such a showing has been made, we conduct a two-part inquiry.

First, "we examine whether, in light of the information available at the time, the trial court abused its discretion in denying the severance motion prior to the guilt phase." (*People v. Simon* (2016) 1 Cal.5th 98, 122.)  " 'In determining whether a trial court's refusal to sever charges amounts to an abuse of discretion, we consider four factors:  (1) whether evidence of the crimes to be jointly tried is cross-admissible; (2) whether some charges are unusually likely to inflame the jury against the defendant; (3) whether a weak case has been joined with a stronger case so that the spillover effect of aggregate evidence might alter the outcome of some or all of the charges; and (4) whether any charge carries the death penalty or the joinder of charges converts the matter into a capital case.' " (*Anderson*, *supra*, 5 Cal.5th at pp. 388-389.)  These are the so-called "*Anderson* factors."

Second, we must determine whether joinder resulted in gross unfairness to the defendant.  "[E]ven if the trial court's ruling was proper as a matter of state law, we will reverse the judgment if the defendant shows that joinder of the charges actually resulted in ' " 'gross unfairness' " ' amounting to a denial of due process during the guilt phase." (*People v. Simon*, *supra*, 1 Cal.5th at p. 123.)

"We review the trial court's decision to deny a severance motion for abuse of discretion." (*People v. Armstrong* (2016) 1 Cal.5th 432, 455-456.) To show an abuse of discretion, "a ' " 'defendant must make a clear showing of prejudice' " ' by demonstrating that the denial 'exceeded the bounds of reason.' [Citation.] 'An appellate court evaluates such claims in light of the showings made and the facts known by the trial court at the time of the court's ruling.' " (*People v. Westerfield, supra*, 6 Cal.5th at p. 689.)

### C. *Analysis*

#### i. The *Anderson* Factors

Queen does not contend that his crimes failed to meet the statutory requirements for joinder under section 954. In any event, we agree with the Attorney General's assertion that most of the " 'offenses [were] connected together in their commission' " (§ 954), as most of the crimes were related to Queen's firearm manufacturing activities, or they were " 'the same class of crimes or offenses' " (§ 954) because they were assaultive crimes. We therefore turn to the question of whether Queen has made a clear showing of prejudice, a requisite to establishing an abuse of discretion by the court in denying a motion to sever. (See *People v. Simon, supra*, 1 Cal.5th at pp. 122-123.)

#### 1. *Cross-Admissibility of Evidence*

" '[T]he first step in assessing whether a combined trial [would have been] prejudicial is to determine whether evidence on each of the joined charges would have been admissible, under Evidence Code section 1101, in separate trials on the others. If so, any inference of prejudice is dispelled.' " (*People v. Bradford* (1997) 15 Cal.4th 1229, 1315-1316, quoting *People v. Balderas* (1985) 41 Cal.3d 144, 171-172.)

In the present case, the prosecutor argued that Queen's continuing behavior indicated a specific style, which clearly refers to a modus operandi. The prosecutor further argued that Queen's criminal acts were based upon the same motives. Although the trial court found that the evidence would be cross-admissible, it did not clarify

22.

whether it specifically found the nonmurder evidence admissible as evidence of motive, intent, or modus operandi, under Evidence Code section 1101, subdivision (b).[6]

Following our review of the record, we have no doubt that if Queen had been tried separately for the crimes related to Holsonbake's murder and the non-murder offenses, a substantial portion of the evidence would have been cross-admissible. The evidence showed that Queen employed a distinct modus operandi for extracting information from people. (See *People v. Earle* (2009) 172 Cal.App.4th 372, 394 ["an inference of identity can be drawn from 'a distinctive modus operandi' "].) Queen would force or lure his victims into an isolated location, torture them physically or psychologically by threatening them with firearms, and would question them.

Queen used this method with C.S., when he zip-tied him to a chair, shocked him with a dog collar and pistol whipped him before questioning C.S. about the AR-15 lower receiver; again, when he drove M.F. to an orchard, pointed a gun at her head, and demanded to know whether Despot was cheating on him; and again, when armed with what initially appeared to be a gun, he forced C.S. into a truck and tried to force C.S. to state that Queen was not selling guns.

The prosecutor theorized that Queen utilized this same method of operation to extort a confession from Holsonbake concerning the firearm that Queen believed Holsonbake had stolen from him on New Year's Eve. According to the prosecutor,

---

[6] This error alone does not entitle Queen to reversal of his conviction. As our Supreme Court has explained, "article VI, section 13 generally 'prohibits a reviewing court from setting aside a judgment due to trial court error unless it finds the error prejudicial.' [Citation.] The section applies to both constitutional and nonconstitutional errors. [Citation.] It 'empower[s]' appellate courts 'to examine "the entire cause, including the evidence," ' and 'require[s]' them 'to affirm the judgment, notwithstanding error, if error has not resulted "in a miscarriage of justice." ' " (*F.P. v. Monier* (2017) 3 Cal.5th 1099, 1108.) And, for purposes of a motion to sever, even if none of the evidence were cross-admissible, that alone would not demonstrate prejudicial error. (See *Alcala v. Superior Court* (2008) 43 Cal.4th 1205, 1221.)

Queen and Despot kidnapped Holsonbake; took him to Vandecasteele's garage; restrained Holsonbake using zip ties; stuck a gun into his mouth, knocking out his two front teeth; and then shot Holsonbake in the head. Evidence of Queen's modus operandi was arguably sufficiently distinct to support the inference of identity, allowing the jury to conclude that Queen, and not Despot, had killed Holsonbake.

But even assuming the circumstances of the non-murder offenses were not sufficiently distinct to demonstrate that Queen employed a distinct method of operation, these crimes were mutually relevant to the question of motive and intent as to the murder charges. (Compare, *People v. Ewoldt* (1994) 7 Cal.4th 380, 403 ["The greatest degree of similarity is required for evidence of uncharged misconduct to be relevant to prove identity"], to *Anderson, supra*, 5 Cal.5th at p. 389 ["The least degree of similarity is required to prove intent. All that is needed is for the crimes to be sufficiently similar to support an inference that the defendant probably had the same intent each time"].) Moreover, given the highly probative value of the non-murder evidence to the murder charges, we find no basis that called for its exclusion under Evidence Code section 352.

Queen attempts to resist this conclusion by arguing that the evidence supporting the non-murder crimes "was plainly inadmissible under Evidence Code section 1101 in the murder case." However, even if none of the evidence were cross-admissible, that alone is insufficient to show the trial court abused its discretion by failing to sever the murder and non-murder cases. "[T]he complete absence of cross-admissibility does not, by itself, demonstrate prejudice from a failure to order a requested severance." (*Alcala v. Superior Court, supra*, 43 Cal.4th at p. 1221.) And, for the reasons discussed below, assuming the evidence was not cross-admissible, the record does not support Queen's claim of prejudice.

### 2. *Potential that Evidence Will Inflame the Jury*

The details of Holsonbake's murder and dismemberment were undeniably gruesome. But as repulsive as this evidence may have been "repulsion alone does not

necessarily engender undue prejudice." (*People v. Simon*, *supra*, 1 Cal.5th at p. 124.) The issue is " 'whether " 'strong evidence of a lesser but inflammatory crime might be used to bolster a weak prosecution case' on another crime." ' " (*Ibid*.) The record supports the conclusion that the trial court here accurately assessed the relative strength of both the murder and non-murder cases to be equal.

### 3. *Spillover Effect: Weak Case Joined to Strong Case*

Neither the murder case nor the non-murder case were comparatively stronger or weaker to one another. Indeed, strong evidence supported both cases.

With respect to the non-murder assaultive crimes, some of the incidents, including the burglary and kidnapping of C.S. were observed by independent eyewitnesses. Other crimes, including, the criminal threats and assault with a firearm against M.F., were referenced in Facebook and text messages shortly after the crimes occurred and long before Queen was arrested or criminally charged. This bolstered the veracity of the witness's claims.

Moreover, the fact that Queen, a convicted felon, had multiple firearms and ammunition in his possession at any given time was virtually irrefutable, and there was a mountain of evidence showing that he was manufacturing and then selling firearms with Despot's assistance.

There was also strong evidence showing that Holsonbake's murder was premeditated, despite the jury's subsequent findings to the contrary. Queen and Despot mutually disliked Holsonbake and both had previously expressed a desire to kill him. Queen commented that he wanted to take Holsonbake to a garage to torture him, which he referred to as a torture chamber. And, the night that Holsonbake was murdered, Queen told Vandecasteele that he wanted to use his garage to get Holsonbake to admit that he had stolen a gun from Queen.

The evidence also showed that Queen used zip ties and rope during the incident, and that the injuries to Holsonbake's skull were consistent with a gunshot wound to the

25.

head.  At the time of the in limine hearing, the prosecutor had evidence showing that Queen had made repeated attempts to thwart the investigation into Holsonbake's disappearance, and that Queen had fled from police during the course of his arrest.  His actions strongly evinced a consciousness of guilt.

Indeed, the evidence that Queen had murdered Holsonbake with express malice was so compelling that if the non-murder crimes had been tried separately, we are confident that the outcome at the respective trials would have been the same.  Queen's assertions to the contrary are without merit.

### 4.  Capital Punishment Factor

This case did not implicate capital punishment; the prosecutor never charged Queen with a special circumstance allegation.  Thus, this factor does not "militate[ ] against the benefits of joinder in the present proceedings."  (*People v. Soper* (2009) 45 Cal.4th 759, 780.)

### ii.  Gross Unfairness

"Even if we conclude that the trial court was well within its discretion in denying severance pretrial, we must also discern ' "whether events *after* the court's ruling demonstrate that joinder actually resulted in 'gross unfairness' amounting to a denial of defendant's constitutional right to fair trial or due process of law." ' [Citation.]  Whether joinder worked a gross unfairness turns upon … whether it was 'reasonably probable that the jury was influenced by the joinder in its verdict of guilt.' " (*People v. Vargas* (2020) 9 Cal.5th 793, 819.)  "[A] judgment will be reversed on this ground only if it is 'reasonably probable that the jury was influenced [by the joinder] in its verdict of guilt.' " (*People v. Merriman*, *supra*, 60 Cal.4th at p. 49, quoting *People v. Bean* (1988) 46 Cal.3d 919, 940.)

Despite strong evidence implicating him in the premeditated murder of Holsonbake, Queen was found guilty of the lesser offense of second degree murder.  The jury acquitted him of first degree murder, conspiracy to commit murder, the kidnapping

of Holsonbake, torture, as well as the assaultive crimes against S.B. at the Red Roof Inn (count 9), the dog shock collar incident involving C.S. (counts 12 & 13), and the incident wherein Queen threatened M.F. with a firearm in front of her one-year-old daughter (count 8).

This shows that "the jury clearly considered and weighed the evidence carefully as to each charge separately" because the acquittal "demonstrate[s] a careful sifting of the evidence and a properly cautious verdict." (*People v. Moore* (1986) 185 Cal.App.3d 1005, 1013, accord, *People v. Jones* (2013) 57 Cal.4th 899, 927.) Queen's assertion that there is a reasonable probability that the jury would have hung on the second degree murder charge if the murder and non-murder cases had been tried separately is not supported by the record.

We conclude that Queen has failed to make a clear showing of potential prejudice arising from the trial court's refusal to sever the charges related to Holsonbake's murder from the non-murder charges. The trial court did not abuse its discretion in denying his motion to sever.

## II. The Admissibility of the Wiretap Evidence

Queen further contends that the trial court erred by admitting "the wiretap evidence," two recorded phone conversations between Queen and his friend, R.S. which occurred in July of 2019. We find neither error, nor prejudice assuming error, from the trial court's admission of this evidence.

### A. Background

During motions in limine, the prosecutor sought to admit two recorded phone calls from July 2019, discovered as part of a wiretap. The phone calls were between Queen and his good friend, R.S., with whom Queen spoke to by phone nearly every day.

On July 7, 2019, Queen called R.S. to request his assistance with a situation. Two individuals had broken into his car and stolen his old broken cellular phone. The

individuals, who appeared to be two juveniles, fled to a house across the street from Queen.

When R.S. suggested "grabbing some stuff" to handle the issue, Queen expressed concern over his actions being traced back to him since he lived across the street from the perpetrators. During the conversation, Queen told R.S., "*I'm gonna go over there and fucking shove a pistol in his fucking throat.* I'm gonna tell him, 'Look. I got you on video. I don't call cops. But what I will do is take your fucking life you fucking punk.' " (Italics added.) R.S. told Queen that he was on his way over. The prosecutor made an offer of proof explaining that when responding officers arrived, they observed Queen and R.S. outside of Queen's home. The presence of the police ultimately prevented Queen and R.S. from engaging in criminal activity.

During a phone call on July 9, 2019, R.S. and Queen were discussing a purported child molester. R.S. stated that he was going to break the man's hands. Queen responded that R.S. should "[s]moke his ass," and "[p]ut a bullet in his fucking forehead." Queen also suggested tying the man to a chair and setting him on fire.

The prosecutor argued that the phone calls were relevant and admissible to the issues of modus operandi, motive, and intent under Evidence Code section 1101, subdivision (b). He explained that Queen's statement in the July 7th phone call about shoving a firearm down someone's throat was consistent with his behavior during the incidents involving M.F., C.S., and was likely what had occurred to Holsonbake on the night of his murder. The prosecutor explained that the forensic pathologist believed that Holsonbake likely died from a gunshot wound to the face.

As to the July 9th phone call, the prosecutor stated that Queen's suggestion of putting a bullet in someone's head, zip-tying the man to a chair, and lighting him on fire were similar to the dog shock collar incident involving C.S. and what may have occurred to Holsonbake before he was murdered.

After taking the matter under submission, the trial court granted the prosecutor's motion to admit the wiretap evidence. According to the trial court, the phone calls were "so intertwined with [the] modus operandi that the prejudicial effect is outweighed by the probative value."

During his comments in closing argument, the prosecutor stated that the wiretap evidence demonstrated that Queen, as distinct from R.S., is someone who "wants to kill." During the July 7th phone call to R.S., Queen suggested putting a bullet in the forehead of a child molester. The prosecutor continued, and "If someone doesn't learn, what do you do? You tie them to a chair and set them on fire." The prosecutor stated that the jury would need to decide whether Queen was just "shit talking with [R.S.]" or whether these comments were demonstrative of Queen's mindset.

With respect to the July 9th phone call, the prosecutor explained that the incident demonstrated a consistency of behavior by Queen, which "goes to his mindset…how he thinks, how he acts, what he does when he's confronted with an issue." Queen wanted to shove a pistol down a kid's throat because of a broken cellular phone stolen out of Queen's vehicle. The prosecutor pointed out that Queen had testified he took a skateboard from the kid and shot it up with an assault weapon.

According to the prosecutor, "Queen uses violence to deal with his actions or what happens to him. That is what he does. That is his mindset. He has contempt for those that are involved. He makes [a] mockery of those that he feels are his enemies."

The prosecutor subsequently told the jurors that Queen used violence to extract information from people. This happened with C.S., M.F., and Holsonbake. And, Queen used firearms as a means to accomplish this goal. The prosecutor stated, "Tying somebody up, zip-tying them. We know that from [C.S.], from Micah Holsonbake and what is on his arm. We know from the wiretap what Mr. Queen likes to do, shooting to the face or using a gun to the face. We know that from wiretaps and [C.S.] and what happened to Micah Holsonbake."

29.

Finally, in the context of discussing all of the assaultive crimes, the prosecutor commented during rebuttal: "You heard [Queen's] own words. [¶] You heard him talking on the wiretap about what he would do to people. You heard him describing what his conduct is."

## B.     Relevant Legal Principles

Evidence of criminal acts other than the offense being adjudicated is ordinarily inadmissible to prove a propensity to commit such conduct on a particular occasion. (Evid. Code, § 1101, subd. (a).) However, such evidence is admissible when relevant to prove some fact other than the propensity, such as motive, plan, identity, intent, or absence of mistake or accident. (Evid. Code, § 1101, subd. (b).) The relevance of "other crimes" evidence "depends, in part, on whether the act is sufficiently similar to the current charges to support a rational inference of intent, common design, identity, or other material fact." (*People v. Leon* (2015) 61 Cal.4th 569, 598.)

"[T]he degree of similarity required for cross-admissibility ranges along a continuum, depending on the purpose for which the evidence is received. The least degree of similarity is required to prove intent." (*People v. Scott* (2011) 52 Cal.4th 452, 470.) The uncharged act need only be sufficiently similar to the charged offense " 'to support the inference that the defendant " 'probably harbor[ed] the same intent in each instance.' " ' " (*Alcala v. Superior Court*, *supra*, 43 Cal.4th at pp. 1222-1223; see also *Scott, supra*, at p. 471.) By contrast, "a higher degree of similarity is required to prove common design or plan, and the highest degree of similarity is required to prove identity." (*People v. Soper, supra,* 45 Cal.4th at p. 776, fns. omitted.)

Here, the trial court admitted the wiretap evidence as evidence of modus operandi, which goes to the issue of identity. "[A]n inference of identity can be drawn from 'a distinctive modus operandi,' but again, to be admissible on this basis, 'the evidence must disclose common marks or identifiers, that, considered singly or in combination, support a strong inference that the defendant committed both crimes.' [Citation.] 'These

30.

common marks must be distinctive rather than ordinary aspects of any such category of crime. They must be sufficiently distinctive that they bear defendant's unique "signature." Reaching a conclusion that offenses are signature crimes requires a comparison of the degree of distinctiveness of shared marks with the common or minimally distinctive aspects of each crime.' " (*People v. Earle*, *supra*, 172 Cal.App.4th at p. 394, italics omitted.)

"Prior" uncharged acts include acts occurring before the defendant's trial on the charged offenses. Thus, the prior acts can occur after the arrest for the offense currently being tried. (*People v. Balcom* (1994) 7 Cal.4th 414, 426 [" ' "Both prior conduct *and subsequent conduct* may be relevant ..., depending on the circumstances and the probative value of the collateral conduct sought to be proven" ' "]); *People v. Garcia* (2001) 89 Cal.App.4th 1321, 1334-1335 ("Nothing in Evidence Code section 210, defining 'relevant' evidence limits such evidence to a time frame before the crime at issue"].) Further, the prior uncharged acts do not need to result in a criminal conviction to be admissible. (See *People v. Garcia* (1995) 41 Cal.App.4th 1832, 1849, disapproved on another point in *People v. Sanchez* (2001) 24 Cal.4th 983, 991, fn. 3; accord.)

Evidence of uncharged criminal conduct must not contravene other policies limiting admission, such as those contained in Evidence Code section 352. (*People v. Balcom, supra*, 7 Cal.4th at p. 426.) We review the trial court's ruling on the admission of evidence under Evidence Code sections 1101 and 352 under the deferential standard of abuse of discretion. (*People v. Cole* (2004) 33 Cal.4th 1158, 1195.) The trial court abuses its discretion when its ruling falls outside the bounds of reason. (*People v. DeSantis* (1992) 2 Cal.4th 1198, 1226.)

## C.    Analysis

The identity of Holsonbake's killer was a disputed issue at the time of the trial court's ruling, as were the issues of motive and intent. Motive and intent were also disputed issues with respect to the assaultive crimes Queen perpetrated against C.S.,

M.F., and S.B.  Making a criminal threat, the crime charged in count 6, is a specific intent crime.  (See § 422.)  Queen's motive for the uncharged acts discussed in the wiretap calls tended to explain his motive for his earlier charged crimes.[7]  Both the uncharged acts and the charged crimes are explainable as a result of the same motive.  (See *People v. Spector* (2011) 194 Cal.App.4th 1335, 1381.)

The trial court specifically held that the wiretap evidence was admissible as evidence of modus operandi, which is relevant to showing identity.[8]  The degree of similarity required for the admission of evidence of uncharged acts to establish a recurring modus operandi need not be identical in every detail; it is enough that the characteristics relied upon are sufficiently distinct to permit a fair inference that a pattern exists.  (*People v. Haston* (1968) 69 Cal.2d 233, 249, fn. 18.)  That pattern however must be " 'so unusual and distinctive as to be like a signature.' "  (*People v. Ewoldt, supra*, 7 Cal.4th at p. 403.)

While the acts described by Queen during the wiretap phone calls were not identical to the crimes with which he was charged, they were sufficiently similar to

---

[7]  Queen does not challenge the admission of the wiretap evidence as to the non-murder charges.  But, the record does not show that trial counsel argued that if this evidence were held admissible, the jury should be instructed to consider the wiretap evidence only with respect to the non-murder charges.

[8]  The jury instructions advised the jury to consider evidence of these uncharged acts only for the limited purpose of intent, motive, or *plan/common scheme* rather than modus operandi.  Common plan and modus operandi are distinct concepts; a common plan proves that an *act* occurred, while modus operandi is relevant to show the *identity* of the perpetrator.  (*People v. Ewoldt, supra*, 7 Cal.4th at pp. 393-394, fn. 2.)

For example, the wiretap calls, if credited, would have been relevant to show that Holsonbake had in fact been tortured, an act which was in dispute.  But, the jury ultimately acquitted Queen of this charge, as well as the charges showing that Holsonbake's murder had been premeditated.  Indeed, the jury's findings tend to show that it did not find the wiretap evidence persuasive, as Queen was also acquitted of charges arising from the dog shock collar incident involving C.S., during which he restrained C.S. with zip ties.  Thus, this error was not prejudicial.

permit a jury to infer that Queen had perpetrated the assaultive crimes against M.F., S.B., and C.S., and that Queen had murdered Holsonbake. As discussed in section I, *ante*, Queen employed a common modus operandi when he wanted information from someone: he isolated his victims, restrained them, and used a gun to coerce confessions from them. This is how Queen interrogated M.F., to determine whether Despot was cheating on him; he did this to C.S., when Queen wanted C.S. to admit that he had stolen his AR-15 lower receiver; and to Holsonbake, whom Queen was convinced had stolen a gun from him.[9]

During the June 7th phone call between Queen and R.S., he declared using firearms to once again threaten someone who had wronged him. After two juveniles broke into Queen's Suburban and stole a broken cellular phone from inside, Queen declared that he was going to "fucking shove a pistol in [the perpetrator's] fucking throat." He added, " 'I'm gonna tell him, 'Look. I got you on video. I don't call cops. But what I will do is take your fucking life you fucking punk.' "

As Queen demonstrated time and time again, when someone wronged him, he confronted them with violence, using firearms, and occasionally, restraints, to render his victims completely helpless. With respect to the murder of Holsonbake, Queen's statement that he would stick a pistol down the throat of someone who had stolen from him in the July 7th phone call, was compelling evidence of the fact that he was the one who had shot Holsonbake in the head.

During the July 9th phone call, Queen suggested shooting a man in the head, and tying him to a chair with zip ties and then lighting him on fire. The use of zip ties and

---

[9] The prosecutor made an offer of proof, stating that the pathologist would opine Holsonbake had likely died from a gunshot wound to the face. Queen observes that neither of the pathologists could ultimately opine, with certainty, how Holsonbake died. However, one of the pathologists testified that Holsonbake's wounds were consistent with but not specific to a gunshot wound to the head. Thus, nothing that the pathologists subsequently testified to undermined the credibility of the prosecutor's offer of proof made at the time of the trial court's ruling on the admissibility of the wiretap evidence.

torture were Queen's signature moves. Queen used zip ties to restrain C.S. during the dog shock collar incident before torturing him by shocking him and pistol whipping him. The prosecutor alleged that Queen had zip tied Holsonbake before torturing and then murdering him. Although these were not identical crimes, they were sufficiently similar to warrant admission of the uncharged crime evidence, at a minimum, to show Queen's motive and intent as to the murder-related crimes and the non-murder assaultive crimes.

Further, considering the highly probative value of the wiretap phone calls, we agree with the trial court's conclusion that their admission substantially outweighed any potential for prejudice. (See Evid. Code, § 352, subd. (b).) This evidence was no more inflammatory than the crimes with which Queen had been charged.

Assuming however that the trial court erred by admitting the wiretap evidence, we do not agree with Queen's assertion of prejudice. The erroneous admission of prior misconduct evidence does not compel reversal unless a result more favorable to the defendant would have been reasonably probable if the evidence had been excluded. (*People v. Watson* (1956) 46 Cal.2d 818 (*Watson*); *People v. Malone* (1988) 47 Cal.3d 1, 22 [error in admitting improper character evidence tested examined under *Watson's* harmless error standard]; accord, *People v. Escobar* (1996) 48 Cal.App.4th 999, 1025, disapproved on other grounds in *People v. Mendoza* (2000) 23 Cal.4th 896, 923-925.)

Assuming the wiretap evidence had been excluded, we are confident that the jury would have reached the same verdict. Despite the probative value of the wiretap evidence, the jury acquitted Queen on count 1's greater offense of first degree premeditated murder, and on counts 2, 3, 4, 5, 8, 9, 12, 13, 15, and 26. If the jury had credited the wiretap evidence, it would likely have reached a different verdict on the dog shock collar incident involving C.S., as the acts Queen described in the July 9th wiretap phone call were similar to this incident. But, Queen was acquitted of the crimes related to this incident, suggesting the jury likely did not consider the wiretap evidence to be probative of anything more than posturing between friends.

Queen contends that the prosecutor's comments in closing argument, specifically, the prosecutor's heavy reliance upon the wiretap evidence, increased the likelihood of prejudice. He also suggests that the prosecutor's comments signaled to the jury that it could consider the wiretap evidence for an improper purpose: showing that Queen had a propensity for violence.[10] We presume that the jury followed the trial court's instruction not to consider the wiretap evidence for such a purpose. (*People v. Acosta* (2014) 226 Cal.App.4th 108, 119 ["We presume that jurors are intelligent and capable of correctly understanding, correlating, applying, and following the court's instructions."].)

The record does not support Queen's assertion that the jury was unfairly persuaded by the wiretap evidence, or the prosecutor's reference to that evidence in closing argument. Finding no reasonable probability of a different outcome at trial had the wiretap evidence not been admitted, we reject Queen's assertion that the admission of this evidence requires reversal of his conviction. The evidence, if erroneously admitted, was not prejudicial.

## III. The Trial Court's Instruction on Aiding and Abetting an Implied Malice Murder

Finally, Queen contends that the jury instructions permitted the jury to convict him of second degree murder without finding that he acted with express or implied malice. This is because the instruction on aiding and abetting was not tailored to the crime of implied malice murder.

We accept Queen's claim of instructional error. However, we are persuaded, beyond a reasonable doubt, that Queen was not prejudiced as a result of the error.

---

[10] Preliminarily, we observe that none of the prosecutor's comments that Queen directs us to were challenged by a timely and specific objection below. In any event, the prosecutor's comments, considered in the full context of his closing argument, did not signal to the jury that it could consider the uncharged acts for an improper purpose, such as to show that Queen had a propensity for violence.

## A. Background

The jury was instructed on CALCRIM No. 401, which states the following: "To prove that the defendant is guilty of a crime based on aiding and abetting that crime, the People must prove that:

"1. The perpetrator committed the crime;

"2. The defendant knew that the perpetrator intended to commit the crime;

"3. Before or during the commission of the crime, the defendant intended to aid and abet the perpetrator in committing the crime;

"AND

"4. The defendant's words or conduct did in fact aid and abet the perpetrator's commission of the crime.

"Someone aids and abets a crime if he or she knows of the perpetrator's unlawful purpose and she specifically intends to, and does in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime.

"If all of these requirements are proved, the defendant does not need to actually have been present when the crime was committed to be guilty as an aider and abettor.

"If you conclude that defendant was present at the scene of the crime or failed to prevent the crime, you may consider that fact in determining whether the defendant was an aider and abettor. However, the fact that a person is present at the scene of a crime or fails to prevent the crime does not, by itself, make him or her an aider and abettor."

With respect to malice, the jury was instructed as follows:

"There are two kinds of malice aforethought, express malice and implied malice. Proof of either is sufficient to establish the state of mind required for murder.

"The defendant had *express malice* if he unlawfully intended to kill. The defendant had *implied malice* if:

"1. He intentionally committed the act;

36.

"2. The natural and probable consequences of the act were dangerous to human life;

"3. At the time of the act, he knew his act was dangerous to human life; and

"4. He deliberately acted with conscious disregard for human life."

During his comments in closing argument, the prosecutor briefly discussed implied malice murder and second degree murder, but he never suggested a non-murder crime that Queen could have aided and abetted Despot in the commission of, which resulted in Holsonbake's murder.

Instead, the entirety of the prosecutor's arguments concerning Queen's liability for murder were premised upon express malice, suggesting that Queen had either perpetrated Holsonbake's murder, which was premeditated, or that Queen directly aided and abetted Despot in the commission of that crime.

## B. Relevant Legal Principles

### 1. Aiding and Abetting Implied Malice Murder

Murder is the unlawful killing of a human being with malice aforethought. (§ 187, subd. (a).) Malice may be express or implied. (§ 188, subd. (a).) It is express when there is an intent to kill. (§ 188, subd. (a)(1).) It is implied when " 'the killing is proximately caused by " 'an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life.' " ' " (*People v. Reyes* (2023) 14 Cal.5th 981, 988 (*Reyes*).)

To be liable for murder as an aider and abettor, the prosecution must show that the defendant "(i) with knowledge of the unlawful purpose of the perpetrator, (ii) and with the intent or purpose of committing, facilitating or encouraging commission of the crime, (iii) by act or advice, aid[ed], promote[d], encourage[d] or instigate[d] the commission of the crime." (*People v. Cooper* (1991) 53 Cal.3d 1158, 1164.) Thus, aider and abettor liability is " 'based on a combination of the direct perpetrator's acts and the aider and

abettor's *own* acts and *own* mental state.' " (*People v. Powell* (2021) 63 Cal.App.5th 689, 710 (*Powell*), citing *People v. McCoy* (2001) 25 Cal.4th 1111, 1117.)

For aiding and abetting liability on a theory of implied malice murder, "the direct aider and abettor must, by words or conduct, aid the commission of the life-endangering *act*, not the result of that act [i.e., murder]. The mens rea, which must be personally harbored by the direct aider and abettor, is knowledge that the perpetrator intended to commit *the act*, intent to aid the perpetrator in the commission of the *act*, knowledge that *the act* is dangerous to human life, and acting in conscious disregard for human life." (*Powell*, *supra*, 63 Cal.App.5th at p. 713.)

### 2. *Langi, Powell, Maldonado and the Pattern Instruction on Aiding and Abetting*

In *Powell,* three or four men, including Powell and Langlois, broke into the victim's home, beat him in retaliation for an earlier altercation, and then fled. The victim was stabbed three times, one of which was fatal, and he had sustained multiple blunt force injuries to his body. (*Powell, supra*, 63 Cal.App.5th at pp. 691-692, 699.)

The prosecutor asserted that during the course of the attack, Powell had stabbed the victim in the heart, killing him. As to Langlois, the prosecutor argued that he was liable for murder either by aiding and abetting the assault, the natural and probable consequence of which was murder, or that he was a direct aider and abettor to the murder that had acted with express malice. (*Powell, supra*, 63 Cal.App.5th at pp. 692, 708-709.) Powell and Langlois were both convicted of second degree murder, among other crimes. (*Id.* at pp. 691-692.)

On appeal, Langlois challenged the prosecutor's use of the aiding and abetting instruction (CALCRIM No. 401), which had not been tailored for the crime of implied malice murder. (*Powell*, *supra*, 63 Cal.App.5th at pp. 709-710.)

The pattern instruction stated the following:

" 'To prove that the defendant is guilty of a crime based on aiding and abetting that crime, the People must prove the following:

" '1. The perpetrator committed *the crime*.

" '2. The defendant knew that the perpetrator intended to commit *the crime*.

" '3. Before or during the commission of the crime, the defendant intended to aid and abet the perpetrator in committing *the crime*; and

" '4. The defendant's words or conduct did in fact aid and abet the perpetrator's commission of *the crime*.

" 'Someone aids and abets a crime if he knows of the perpetrator's unlawful purpose, and he specifically intends to and does in fact aid, facilitate, promote, encourage, or instigate the perpetrator's commission of *that crime*.

" 'If all of these requirements are proved, the defendant does not need to actually have been present when the crime was committed to be guilty as an aider and abettor.

" 'If you conclude that defendant was present at the scene of the crime or failed to prevent the crime, you may consider that fact in determining whether the defendant was an aider and abettor; however, the fact that a person is present at the scene of a crime or fails to prevent the crime does not by itself make him an aider and abettor.' " (*Powell, supra*, 63 Cal.App.5th at pp. 706-707.)

Langlois argued that the aiding and abetting instruction was not properly tailored for the crime of implied malice murder, because " 'the crime' " referenced by the pattern instruction was the crime of murder. (*Powell, supra*, 63 Cal.App.5th at p. 714.) Thus, the pattern instruction "couches direct aiding and abetting liability in terms of the aider and abettor knowing the perpetrator intended to commit *the crime* [i.e., murder], the aider and abettor intending to aid and abet the perpetrator in committing *the crime*, and that, by words or conduct, the aider and abettor in fact aided the perpetrator's commission of *the crime*." (*Id.* at p. 714.)

The appellate court agreed that the trial court had erred by failing to tailor the aiding and abetting instruction to implied malice murder, explaining, "the aider and

abettor of implied malice murder need not intend the commission of *the crime* of murder," but only need intend the perpetrator's act. (*Powell, supra,* 63 Cal.App.5th at p. 714.) However, the appellate court found that the error was harmless beyond a reasonable doubt because the prosecutor had never advanced a theory of direct aiding and abetting liability as to implied malice.[11] (*Id.* at pp. 714-715.)

Relying on *Powell*, *People v. Langi* (2022) 73 Cal.App.5th 972 (*Langi*), held that the pattern instruction on aiding and abetting, when not tailored for the crime of implied malice murder, permitted the jury to find the petitioner guilty of second degree murder by imputing malice to him. (*Id.* at p. 982.) During the course of a robbery, someone in Langi's group punched the victim, causing him to fall and strike his head, killing him. (*Id.* at p. 975.) From the record, there was no indication that the jury made an express finding as to who had thrown the fatal punch. (*Id.* at p. 980.)

Langi filed a petition for resentencing under former section 1170.95, arguing that he had been convicted of second degree murder under a theory of imputed malice, though the jury was not instructed on the natural and probable consequences doctrine or the felony murder doctrine. (*Langi, supra*, 73 Cal.App.5th at p. 975.) His petition was summarily denied by the trial court. (*Id.* at p. 976.)

The appellate court concluded that the record did not negate the possibility that malice had been imputed to Langi. The court explained that where "a trial court uses [the aiding and abetting instruction] without tailoring it to the specifics of that crime, the instruction creates an ambiguity under which the jury may find the defendant guilty of aiding and abetting second degree murder without finding that he personally acted with

---

[11] Although the prosecutor had relied upon the natural and probable consequences doctrine as one of the theories supporting Langlois's liability for murder, a now defunct theory, at the time of his direct appeal, any relief to which Langlois was arguably entitled was available only by the petition process under former section 1170.95. (See *People v. Gentile* (2020) 10 Cal.5th 847, 854-855, superseded by statute on other grounds as stated in *People v. Glukhoy* (2022) 77 Cal.App.5th 576, 584.)

malice." (*Langi, supra*, 73 Cal.App.5th at p. 982.) In other words, the defendant may be convicted of murder upon a theory of imputed malice.

This ambiguity arises from two instructions, CALJIC No. 3.01, the standard instruction on aiding and abetting, and CALJIC No. 8.31, the instruction on second degree murder.[12] (*Langi, supra*, 73 Cal.App.5th at p. 981.) And, more specifically, when the aiding and abetting instruction is not tailored to the crime of implied malice murder.

CALJIC No. 8.31, as given to the jury, defined second degree murder as follows: "a killing is a second degree murder if '1. The killing resulted from an intentional act, [¶] 2. The natural consequences of the act are dangerous to human life, and [¶] 3. The act was deliberately performed with knowledge of the danger to, and with conscious disregard for, human life. [¶] When the killing is the direct result of such an act, it is not necessary to prove that the defendant intended that the act would result in the death of a human being.' " (*Langi, supra*, 73 Cal.App.5th at p. 981.)

"CALJIC No. 3.01[] … state[s] that 'A person aids and abets the commission ... of a crime when he or she: [¶] (1) With knowledge of the *unlawful purpose* of the perpetrator, and [¶] (2) With the intent or purpose of committing or encouraging or facilitating the commission of the crime, ... [¶] (3) By act or advice aids, promotes, encourages or instigates the commission of the crime.' " (*Langi, supra*, 73 Cal.App.5th at p. 981, italics added.)

*Langi* explained that the "[t]he aiding-and-abetting instruction state[s] that a person aids and abets a crime if he or she acts 'with knowledge of the *unlawful purpose of the perpetrator*, and ... with the intent or purpose of committing or encouraging or facilitating the commission of the crime.' (CALJIC No. 3.01, italics added.) However,

---

[12] CALJIC No. 3.01 is the predecessor to CALCRIM No. 401 and CALJIC No. 8.31 is the predecessor to CALCRIM No. 520.

41.

… the second degree murder instruction specified that the direct perpetrator of that crime need not act with the unlawful intent of causing death. Thus, while the perpetrator [the actual killer] must have deliberately performed the fatal act 'with knowledge of the danger to, and with conscious disregard for, human life' (CALJIC No. 8.31), his purpose may have been only to strike or to injure, or conceivably only to embarrass, the victim. Since the perpetrator's purpose need not have been to kill the victim, the aider and abettor's knowledge of that purpose similarly need not have been knowledge that the perpetrator aimed to kill. If the perpetrator need not have had 'murderous intent,' certainly the aider and abettor need not have had such an intent." (*Langi*, *supra*, 73 Cal.App.5th at pp. 982-983.) The appellate court stated that the aiding and abetting instruction should have been amended to explain that an aider and abettor to murder must, at a minimum, have acted with the mental state of implied malice. (*Id.* at p. 983.)

Finally, in *People v. Maldonado* (2023) 87 Cal.App.5th 1257 (*Maldonado*) the defendant was convicted of first degree lying-in-wait murder. He petitioned the trial court for resentencing relief under section 1172.6, arguing that CALCRIM No. 401 permitted the jury to convict him of murder by imputing malice to him from his participation in the crime. (*Maldonado*, *supra,* 87 Cal.App.5th at p. 1259.)

The court agreed because first degree lying-in-wait murder, unlike first degree premeditated murder, could be accomplished with implied rather than express malice, making use of CALCRIM No. 401 problematic. The court explained, "The People argue *Powell* and *Langi* are distinguishable because the convictions in those cases were for second degree murder, while appellant was convicted of first degree murder. The distinction is immaterial because, … first degree lying-in-wait murder can be based on a theory that the perpetrator acted with implied malice rather than an intent to kill. *Powell* and *Langi's* analyses of the standard instructions for aiding and abetting an implied malice murder apply here." (*Maldonado*, *supra,* 87 Cal.App.5th at p. 1267.)

The appellate court explained that the jury could have misconstrued the instructions "such that, 'to be guilty as an aider and abettor of [lying in wait first degree] murder, [the] appellant need only have intended to encourage the perpetrator's intentional act—in this case, [a surprise attack on the victim]—whether or not [the] appellant intended to aid or encourage [the victim's] killing, and whether or not he personally knew of and disregarded the risk of such a killing.' " (*Maldonado, supra*, 87 Cal.App.5th at p. 1266, quoting *Langi, supra,* 73 Cal.App.5th at p. 983.) In view of the ambiguous instructions, the appellate court was unable to conclude that the record conclusively established Maldonado was ineligible for section 1172.6 as a matter of law. (*Maldonado,* at p. 1269.)

### 3. *Standard of Review*

" ' "In determining whether error has been committed in giving or not giving jury instructions, we must consider the instructions as a whole ... [and] assume that the jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given. [Citation.]" ' [Citation.] 'Instructions should be interpreted, if possible, so as to support the judgment rather than defeat it if they are reasonably susceptible to such interpretation.' " (*People v. Martin* (2000) 78 Cal.App.4th 1107, 1111-1112.)

We review de novo whether jury instructions correctly state the law. (*People v. Posey* (2004) 32 Cal.4th 193, 218.) The test is whether there is a " 'reasonable likelihood' that the jury misconstrued or misapplied the law in light of the instructions given, the entire record of trial, and the arguments of counsel." (*People v. Dieguez* (2001) 89 Cal.App.4th 266, 276; *People v. Houston* (2012) 54 Cal.4th 1186, 1229; *People v. Fiu* (2008) 165 Cal.App.4th 360, 370.)

### C. Analysis

The Attorney General contends that *Powell*, *Langi*, and *Maldonado* were incorrectly decided, because the pattern aiding and abetting instruction correctly states

the law. Whether CALCRIM No. 401 correctly states the law boils down to what the jury reasonably understood the phrase "unlawful purpose" to mean as it appears in the following portion of the instruction: "Someone *aids and abets* a crime if he or she knows of the perpetrator's unlawful purpose and he or she specifically intends to, and does in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime." (CALCRIM No. 401.)

*Langi* concluded that "unlawful purpose," which is undefined in the aiding and abetting instruction, could be interpreted to narrowly refer to the motive or reasons a perpetrator committed an act dangerous to human life, and not, with respect to the crime of murder, express or implied malice. (*Langi, supra*, 73 Cal.App.5th at p. 982.) Thus, if the perpetrator merely intended to assault the victim, and the aider and abettor knew of that unlawful purpose and aided the perpetrator in the commission of that act, he or she could be liable for murder resulting from the victim's death, even if the aider and abettor did not intend to encourage the killing, and whether or not he personally knew of and disregarded the risk of such a killing. (*Langi, supra*, 73 Cal.App.5th at p. 983.)

We acknowledge that the aiding and abetting instruction is not a model of clarity with respect to the crime of implied malice murder. If a jury were to read the aiding and abetting instruction in isolation, it is possible that it could convict a defendant of aiding and abetting an implied malice murder without finding that he or she acted with malice.[13] This would depend upon how the jury interpreted the phrase "unlawful purpose," and whether it read the pattern instruction on aiding and abetting in isolation, disregarding the murder instruction's requirement that to convict a defendant of murder, the prosecution

---

[13] In September 2023, CALCRIM No. 526 [Implied Malice Murder: Aiding and Abetting] was amended to clarify the elements of this crime. The instruction makes clear that "[b]efore or during the commission of the perpetrator's act[s], the defendant knew the perpetrator's act[s] (was/were) dangerous to human life, and the defendant deliberately acted with conscious disregard for human life." (CALCRIM No. 526.)

44.

must prove that the defendant harbored express or implied malice. (See CALCRIM No. 520.) The term "unlawful purpose" is not defined by the instruction.

Queen asserts that our Supreme Court has conclusively resolved this issue in *Reyes*, *supra*, 14 Cal.5th 981, an appeal from the denial of a petition for resentencing under former section 1170.95. There, the court held, "[CALCRIM No. 520] alone, … does not encompass the elements of aiding and abetting implied malice murder as set out in *Powell*." (*Reyes*, at p. 991.) Our Supreme Court cited with approval to *Powell's* discussion of whether direct aiding and abetting an implied malice murder was a viable legal theory. The *Reyes* court did not address whether CALCRIM No. 520 and CALCRIM No. 401, the pattern instruction on aiding and abetting, adequately convey the requirements of aiding and abetting an implied malice murder. (*Reyes*, at p. 991, citing *Powell, supra*, 63 Cal.App.5th at pp. 712-713.) Moreover, the trial court's ruling clearly indicated that it had misunderstood the elements of the crime of aiding and abetting an implied malice murder. (*Reyes*, at p. 991.)

However, in light of the various court decisions observing CALCRIM No. 401's deficiency as to the crime of aiding and abetting implied malice murder, and the Judicial Council's recent approval of an instruction clarifying the elements of this crime, we agree with Queen's assertion that if the aiding and abetting instruction is not tailored to the crime of implied malice murder, a reasonable jury could misconstrue the elements of this offense. While the existing record lacks any evidence indicating that the jury here was operating under such a misconception, we will presume error.

Instructional errors that fail to require the jury to find an element of a charged crime implicate the heightened test for prejudice articulated in *Chapman v. California* (1967) 386 U.S. 18 (*Chapman*). Under *Chapman*, we "must reverse the conviction unless, after examining the entire cause, including the evidence, and considering all relevant circumstances, … the error was harmless beyond a reasonable doubt." (*People v. Aledamat* (2019) 8 Cal.5th 1, 3.) Where, a jury instruction has omitted an element of

45.

an offense, the reviewing court must determine whether the record contains evidence that could rationally lead to a contrary finding regarding the omitted element. (*Neder v. United States* (1999) 527 U.S. 1, 19; *People v. Cooper, supra*, 14 Cal.5th at pp. 742-743.)

If, after a thorough examination of the record, we are unable to conclude beyond a reasonable doubt that the jury verdict would have been the same absent the error—for example, if the defendant contested the omitted element and raised evidence sufficient to support a contrary finding—we should not find the error harmless. (*Neder v. United States, supra*, 527 U.S. at p. 19.) On the other hand, an instructional error is harmless "where a reviewing court concludes beyond a reasonable doubt that the omitted element was uncontested and supported by overwhelming evidence." (*Id.* at p. 17; accord, *People v. French* (2008) 43 Cal.4th 36, 53.)

Following a careful examination of the record, we conclude that the instructional error here was harmless beyond a reasonable doubt. Use of the instruction on aiding and abetting, which was not tailored to the crime of implied malice murder, made no difference to the jury's verdict. We reach this conclusion for two reasons.

First, contrary to Queen's assertion, the prosecutor never argued that Queen could be convicted of murder by directly aiding and abetting an implied malice murder. The prosecutor's comments during his closing argument were focused almost exclusively on Queen's liability for an express malice murder, a theory which was supported by compelling trial evidence.

The prosecutor explained that both Queen and Despot had a motive to kill Holsonbake, and that Queen had even expressed a desire to torture Holsonbake in a garage that he referred to as a "torture chamber." On the night of the murder, Queen told Vandecasteele that he wanted to use Vandecasteele's garage to interrogate Holsonbake about a missing gun.

The prosecutor further explained that the circumstances of Holsonbake's murder were consistent with Queen's modus operandi. When Queen wanted to extract

46.

information from someone, he would restrain them, and then physically or psychologically torture them until he got a confession. By Queen's own admission, Holsonbake was restrained during the killing with a zip tie, just as C.S. had been during the dog shock collar interrogation. The injuries to Holsonbake's skull suggested that his front teeth may have been knocked out and that he was shot in the head. This conduct was consistent with Queen's comments in the wiretap phone call evidence wherein he suggested shoving a pistol down someone's throat and taking that person's life.

The most compelling evidence that Queen had acted with express malice however came from Queen himself. Despite claiming that Despot had killed Holsonbake unexpectedly, Queen admitted to dismembering Holsonbake, cleaning up the crime scene, scattering Holsonbake's remains, and then making repeated efforts to thwart the investigation into Holsonbake's disappearance and later, his murder. Although Queen testified that the murder had occurred in his own garage, the presence of Holsonbake's blood on a shelf in Vandecasteele's garage, records from Queen's cellular phone, and the total lack of evidence corroborating Queen's version of events, such as the dumbbell purportedly used in the murder, suggested otherwise. The prosecutor theorized that Queen's actions strongly evinced a consciousness of guilt. We agree. Queen was not simply an accessory after the fact to Holsonbake's murder. He was a willing participant, if not the direct perpetrator of the crime.

After discussing the theories and evidence supporting Queen's liability for first degree premeditated murder, the prosecutor turned to the elements of second degree murder. He stated, "second degree murder does not require premeditation and deliberation. It's simply malice aforethought. It's the intent you have before you do the act. [¶]…[¶] … [I]mplied malice only exists for second degree murder."

Although the prosecutor briefly discussed the elements of second degree murder based upon implied malice, he never offered an explanation or advanced a theory of how Queen could be convicted as either a direct perpetrator or an aider and abettor to an

47.

implied malice murder.  Rather, the prosecutor stated that whether it was Queen or Despot that had killed Holsonbake, both were willing accomplices that had knowingly assisted one another in the commission of the murder—which was the intended crime.  In other words, if Queen was merely an aider an abettor, he was an aider and abettor to an express malice murder.

The only implied malice theories of liability for murder advanced by the prosecutor were based upon Queen's participation in Holsonbake's kidnapping (felony murder) and murder by torture.  These theories were ultimately rejected by the jury, as Queen was acquitted of kidnapping Holsonbake and murder by torture.  The prosecutor never suggested that Holsonbake's murder could have been the consequence of some other intended (but uncharged) life endangering act, such as an assault perpetrated by Despot.

Contrary to Queen's assertion, the prosecutor did not steer the jury in the direction of aiding and abetting an implied malice second degree murder.  (See *Powell, supra*, 63 Cal.App.5th at p. 716 [finding no prejudice under *Chapman* from an identical instructional error where the prosecutor did not advance a theory of implied malice murder.)  Queen's assertion that his murder conviction was almost certainly based upon a theory of implied malice is simply not supported by the record.

Second, although the jury ultimately convicted Queen of second degree murder rather than first degree murder, that does not mean that it necessarily found the murder was committed with implied rather than express malice.  As the prosecutor explained, express malice can support a conviction for first or second degree murder.  The more likely explanation for the jury's verdict is that it did not find sufficient evidence of premeditation, likely concluding that while the murder was intentional, it was not deliberate and premeditated because the decision to kill was made "rashly, impulsively, or without careful consideration."  (CALCRIM No. 521.)

We further observe that during deliberations, the jury did not seek clarification on the requirements of murder, aiding and abetting, or express or implied malice. (See *People v. Canizales* (2019) 7 Cal.5th 591, 617 [when evaluating prejudice, "[t]he jury's questions during deliberations are also instructive"].) In fact, there is no evidence in the record to indicate that the jury might have incorrectly applied the jury instructions, thus negating the murder instruction's essential requirement of express or implied malice and convicting Queen of murder based upon a theory never advanced by the prosecutor. "Absent some showing to the contrary, we presume the jury followed the court's instructions." (*People v. Merriman*, *supra*, 60 Cal.4th at pp. 48-49.)

Further, as to *Langi* and *Maldonado*, we observe that cases are distinguishable from the instant case as the issue of prejudice. *Maldonado* addressed an appeal from the trial court's summary denial of a petition for resentencing under former section 1170.95. In *Maldonado*, the People forfeited their contention that there was no reasonable likelihood that the jury instructions permitted the jury to convict the petitioner of murder based upon imputed malice. Given the prosecutor's brief comments on express malice and the "highly confusing nature of the instructions," the appellate court concluded "there was more than a possibility that the jury construed the instructions to permit a conviction based on imputed malice." (*Maldonado, supra*, 87 Cal.App.5th at p. 1268.)

In reaching this conclusion, the appellate court explained that the question before it was whether the record conclusively established that the petitioner was ineligible for resentencing relief as a matter of law. (*Maldonado, supra*, 87 Cal.App.5th at p. 1269.) This standard is plainly favorable to petitioners in showing that the denial of a section 1172.6 petition for resentencing, denied at the prima facie stage, was prejudicial. The presumption is that the allegations made in a petition for resentencing, including the fact that the petitioner was convicted of murder upon a theory of imputed malice, are truthful unless refuted by the record. (See 1172.6, subd. (c).) Because the record did not conclusively refute Maldonado's assertion that he had been convicted of murder upon a

theory of imputed malice, the trial court's order denying his petition was reversed, allowing Maldonado's petition to proceed to an evidentiary hearing. (*Maldonado,* at p. 1269.)

*Langi* also addressed an appeal from the trial court's summary denial of a petition for resentencing. (*Langi, supra*, 73 Cal.App.5th at p. 975.) We further observe that the facts in *Langi* did not affirmatively demonstrate that the prosecutor had relied upon a theory of express malice. Rather, the petitioner had been convicted of an implied malice murder for a group beating that resulted in the victim's death, with no specific jury finding as to who had dealt the fatal blow. (*Id.* at pp. 975, 980, fn. 6.)

While Queen raises an identical instructional error as those raised in *Powell*, *Langi*, and *Maldonado*, only *Powell* is instructive as to the issue of prejudice. Here, as in *Powell*, "the prosecutor did not rely on direct aiding and abetting liability as to implied malice." (*Powell, supra*, 63 Cal.App.5th at p. 715.) Thus, the theory of murder upon which Queen was convicted was express malice murder in the second degree. As discussed, there was compelling evidence supporting this theory. Based upon the foregoing, we are persuaded, beyond a reasonable doubt that Queen was not prejudiced by the trial court's failure to tailor the aiding and abetting instruction to the crime of implied malice murder, a theory never relied upon to prove Queen's liability for murder.

## IV. Correction of the Abstract of Judgment and the Minute Order from the Sentencing Hearing is Required

The Attorney General contends that the abstract of judgment and minute order from Queen's sentencing hearing must be corrected to reflect the trial court's oral pronouncement of judgment as to count 6. We agree.

Queen was convicted for making criminal threats against M.F. on count 6 for the orchard incident. He was sentenced to the upper term of three years, doubled for his prior strike. The sentence was enhanced by four years based upon the jury's true finding on

the section 12022.5 firearm enhancement.  The sentence on the enhancement was stayed pursuant to section 654.

The minute order from the June 7, 2022 sentencing hearing and the abstract of judgment incorrectly reflect that the entire punishment on count 6 was stayed.  These documents must be corrected to reflect the trial court's oral pronouncement of judgment, which is controlling.  (See *People v. Jones* (2012) 54 Cal.4th 1, 89.)  We will remand this matter back to the trial court for that purpose.

## DISPOSITION

The judgment of conviction is affirmed.  The matter is remanded back to the lower court for correction of the abstract of judgment and the minute order dated June 7, 2022, to reflect that the sentence on the enhancement on count 6 was stayed, rather than the sentence on the underlying conviction.


SMITH, J.

WE CONCUR:


DETJEN, Acting P. J.


FRANSON, J.